KELLEY *et al. v.* SPRAGUE *et al.*

(*Supreme Court, General Term, First Department.* December 31, 1890.)

1. FRAUDULENT CONVEYANCE—INTENT OF GRANTOR—RIGHTS OF PURCHASER.

S., who was conducting an hotel, and against whom several judgments and executions were outstanding, desiring to place the property beyond the reach of his creditors, and fearing that his lease might be lost to him if rent, about coming due, were not promptly paid, transferred the lease to Y. in consideration of an agreement by Y. to surrender a claim against S., to pay the rent, and other debts of the hotel, and to employ S. to manage the hotel at a salary for a term of years. Y. knew that S. could not pay his debts, but did not know, and had no reason to know, that there were judgments or executions against him. It appeared that Y.'s notice was, chiefly, to save his own debt due from S., and not to hinder or delay other creditors; and the leasehold interest and property were not shown to have any substantial value above the consideration for the transfer. *Held,* that the circumstances did not establish fraud, actual or legal, for which creditors of S. could impeach the transfer.

2. USURY—WHAT CONSTITUTES.

A sale of stock, at the price for which it had been purchased by the seller and at which he was holding it, although much more than the market price, and more than the price realized by the buyer, the difference being greater than the interest allowed by law on a loan of that amount, is not necessarily usurious.

3. SAME—PERSONAL DEFENSE.

In an action by one creditor to set aside a transfer made by the common debtor to satisfy or secure the debt of another, the plaintiff cannot attack the consideration of the latter debt as usurious; that being an objection, or defense, personal to the debtor, and to the benefit of which third parties are not entitled.

Appeal from judgment on report of referee.

Action by Albert Kelley and another against Daniel J. Sprague and others. There was a judgment in favor of the defendants, and the plaintiffs appeal. The case is fully stated in the opinion of the referee, which the court adopts without change. The opinion of the referee was as follows:

"Yale was a creditor of Sprague to the amount of $5,200 upon a promissory note not due. Sprague was the lessee of the Bartholdi Hotel, which he conducted. Yale proposed to purchase from Sprague an interest in the lease and furniture of the hotel. He offered $10,000 for one-third interest, or $15,000 for a half interest. There were several judgments outstanding and unpaid against Sprague, upon one or more of which executions were in the sheriff's hands, and supplementary proceedings were threatened; but of the existence of these judgments and contemplated proceedings Yale was ignorant. Sprague proposed to sell a half interest for $15,000. Yale desired, before closing the matter, to examine the books of the hotel. He made the examination on the 30th March. From such examination he found that Sprague had drawn out $5,000 over and above the receipts, during the 11 months preceding; that he was indebted for some of the furniture of the hotel; and that the insurance was unpaid. The books contained no reference to judgments against Sprague, or to outside claims. Yale was so dissatisfied with the exhibit made by the books of the business that, on the evening of the 30th March, he withdrew his offer to purchase any interest in the hotel property. On the morning of the 31st day of March, Yale called upon the attorney of Sprague, who was preparing the papers for sale and purchase of the half interest, and informed him that he had withdrawn his offer. The attorney knew about the judgments and executions against Sprague, but he had not given Yale any information in respect to them. Within an hour after Yale had left the attorney's office Sprague called upon him, and said that his attorney wished to see him immediately. Yale accompanied Sprague to his attorney's office, and as soon as he entered he was informed by the attorney, in substance, that Sprague could not pay his rent which would fall due the next day, and that, if the rent was not paid, Sprague would be turned into the street, his lease would be forfeited, and that, in such case, Yale would lose his claim of $5,200 against Sprague. The attorney at the same time informed him that Sprague would

sell him the lease and furniture for his claim. To this Sprague assented. At the same time a paper was presented to Yale for his examination and approval, purporting to be a transfer of the lease. Yale read the paper, but he says that he was so excited at the fear of losing his debt that he was suddenly seized with a rush of blood to the head, to which he was subject, and did not fully comprehend the terms of the written instrument which had been handed to him. He testifies that the understanding between him, Sprague, and the attorney, at the time, was that, as a consideration for the transfer of the lease, he should surrender his claim against Sprague, pay the rent due the next day, about $4,000, the insurance in arrear, and also the debts against the hotel, amounting to $1,700. An inspection of the written instrument, however, shows that the only consideration mentioned is $1, with an agreement on the part of Yale to employ Sprague to manage the hotel for him at a salary of $2,500 per annum, for a period of nine years, and to pay the rent due the next day. As to this special undertaking on his part to employ Sprague, expressed in the written transfer, Yale has testified that he did not know that it was in the paper at the time he executed it. But in this connection he says that he would not have purchased an interest in the lease, or hotel business, or the lease itself, except upon the understanding with Sprague that he would enter into his service, and manage the hotel for him, as he was himself entirely ignorant of such business. Yale, in his interview with Sprague and his attorney, upon the morning of the 31st March, signed the agreement with Sprague. Not knowing the nature of the interview to which he was invited by Sprague, or what was in fact intended to be proposed to him, he had not come prepared to surrender his note. The note was in a safe-deposit company, and was not surrendered until several months afterwards, and then upon the demand of Sprague, when the relations between him and Yale had become unfriendly. The transfer having been made to him, Yale, the next day, provided himself with funds to the amount of $10,000 to pay the obligations he had assumed. Out of this sum he paid the rent due on the 1st day of April, together with the insurance unpaid, taxes to the amount of several hundred dollars in arrears, and the indebtedness of Sprague for furniture. The sums so paid in the aggregate amounted to $7,000 and upwards. The residue of the $10,000 he expended in the purchase of furniture. He, however, received from guests and lodgers of the hotel, after the 1st day of April, nearly enough to restore to him the rent he paid on that day. Yale, with Sprague in his service as manager, carried on the hotel, clearly on his own account, for about the space of two weeks, when, becoming satisfied that its conduct required more capital than he could invest, he, with one Hall, formed a corporation called the 'Bartholdi Hotel Company.' The lease, and hotel furniture and property, which had been added to by Yale in the mean time, was assigned to the corporation by Yale, 'upon payment to him of fifteen thousand dollars.' This amount of $15,000 was paid to him in the stock of the company. Hall, the gentleman who was chiefly interested with Yale in forming the corporation, put in $20,000 in money against what Yale had invested, and he received 200 shares of stock. This money, which Hall invested, with other sums which he afterwards paid in, was used in adding to the furniture and appointments of the hotel, and in the expense of running the same.

"From this cursory *resumé* of the principal facts in the case the question arises, was the transfer of the 31st day of March from Sprague to Yale fraudulent as to the creditors of Sprague? I think that it cannot be doubted but that Sprague, in offering to sell his interest in the lease and property to Yale, was influenced by a desire to place the property beyond the reach of his creditors, who were at the time pressing him with proceedings to collect their debts, and also through a fear that the lease would be lost to him if the rent was not promptly paid on the next day. And, furthermore, it cannot be

doubted that he desired to place the property in hands not unfriendly, and through which he might find employment in the hotel, by which he might earn a livelihood, and, as he said, 'to earn money to pay his creditors.' But Yale, if acting in good faith, and not in furtherance of Sprague's designs, and if purchasing for a valuable and fair consideration without any knowledge or reasonable ground for believing that Sprague was seeking to evade his creditors, would not be affected by any fraudulent intent on Sprague's part. From a careful consideration of the whole evidence, I reach the conclusion that Yale, although he knew that Sprague could not pay his debts, did not know, and in fact had no reason to know, that there were judgments or executions outstanding or existing against Sprague. The motive which chiefly influenced Yale in purchasing the property was to save his debt,—a debt due from a man who was insolvent,—and that his purchase was not made with any design to frustrate, hinder, or delay the creditors of Sprague, but was honestly and in good faith made. I do not find that the leasehold interest and property had any substantial value above what Yale paid and assumed as the consideration for the transfer. Such conclusion is reached, notwithstanding Yale's agreement to employ Sprague to manage the hotel for him. I do not consider that fact as in itself evidence of fraud upon creditors. It was no reservation out of the property sold, but a collateral undertaking to employ the vendor, for which service the vendee was to pay. Yale did not understand the business, which is special in its character. He was obliged to employ some person to aid him, and as Sprague had experience and knew the guests, he was the fittest person to conduct the hotel, and would clearly be entitled to be paid for his services. It is true one Stafford, of Buffalo, had offered $30,000 for the hotel and property, and Yale himself had once offered $15,000 for a half interest. Stafford, when his offer was accepted, did not respond, and Yale, upon an examination of the books, withdrew his offer, upon the basis that the property was not worth as much as he supposed when he made the offer. The rent reserved in the lease was $50,000 per annum, a full rent. The evidence does not justify the conclusion that the lease had any substantial value above the rent reserved. While Sprague conducted the hotel he fell in arrear several thousand dollars, and the new proprietors have not been able to earn sufficient to pay a dividend to the stockholders. In fact, although they have put in a large amount of money, they have not been able to make the business profitable. There is no fact in evidence that can lead me to conclude that the property sold has any such value, in excess of the consideration parted with, and the obligations assumed by the purchaser on account of it, as to render the transaction dishonest or fraudulent as to creditors. The success of past management has shown no such fact, and, if the leasehold interest possesses any such value, the future only can develop and disclose it.

"Some criticism has been made upon the character of the claim in favor of Yale against Sprague which has been surrendered. The note has been called usurious. The claim arose upon a sale of Central New Jersey Railroad stock, considerably above the market price. Yale sold the stock for the same sum at which he had purchased it. He had made up his mind to hold it until it reached that price. Sprague bought it at that price. It was an improvident purchase at the time. But it has since sold for more than double the price he paid for it. Such transaction is not necessarily usurious. But it is not for the plaintiff to raise such question. The matter of usury is an objection personal to the borrower. He can waive it, as he has done in this instance, by discharging the infected obligation, and receiving it without objection in payment for property sold. The result reached, after a full consideration of the whole case, is that the circumstances of suspicion attending the transaction, to which the learned counsel for the plaintiff has called my attention, do not establish fraud, actual or legal, and their existence is not inconsistent with entire honesty and good faith on the part of the defendant Yale. The burden

of showing fraud rested upon the plaintiff in order to impeach the transaction. This he has failed to do; and the result is that the complaint must be dismissed, with costs."

Argued before VAN BRUNT, P. J., and DANIELS and BRADY, JJ.

*J. Noble Hayes,* for appellants. *Stern & Meyers,* for respondents.

PER CURIAM. The question here is substantially one of fact. The findings of the learned referee are fully supported by the evidence, and his legal conclusions properly follow therefrom. We have no doubt, upon the evidence, that the transaction between Sprague and Yale, which is here questioned, was a fair one under the circumstances. Yale took the lease and property which were assigned to him in good faith, and for value. He was entirely innocent of any fraudulent purpose of Sprague's. The same was true of the transfer to the hotel company. The learned referee, in addition to his report, has given his reasons therefor in a careful opinion which covers the main questions discussed before us. We are satisfied with this opinion, and need add nothing further thereto. The judgment should be affirmed, with costs.